**Lisa Hay**
**Federal Public Defender**
**lisa_hay@fd.org**
**Jessica G. Snyder**
**Research & Writing Attorney**
**jessica_snyder@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, Oregon 97204**
**Tel:    (503) 326-2123**
**Fax:    (503) 326-5524**

**Attorney for Defendant**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 6:17-cr-00001-AA** |
| **Plaintiff,** | **AMENDED MOTION TO REDUCE SENTENCE PURSUANT TO** |
| **v.** | **18 U.S.C. § 3582(c)(1)(A)(i) (COMPASSIONATE RELEASE)** |
| **JOHN NATHAN ETZEL,** | |
| **Defendant.** | |

## INTRODUCTION

The defendant, John Nathan Etzel, through his attorneys, respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to reduce his sentence to time served. As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons. Mr. Etzel is a 64-year-old man who suffers from hypertension, chronic bronchitis, and several other serious medical conditions. He has currently served 59 months—approximately 75% of his sentence including good time.  His serious medical condition and age, combined with the COVID-19 pandemic that is spreading through our federal

**PAGE 1.    AMENDED MOTION TO REDUCE SENTENCE (COMPASSIONATE RELEASE)**

prisons, and the short time remaining on his sentence, provide an extraordinary and compelling basis for immediate sentence reduction.

**Statutory Framework for Sentence Reduction Authority Under 18 U.S.C. § 3582(c)(1)(A)(i)**

The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

(1) in any case--

(A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--**

(i) **extraordinary and compelling reasons warrant such a reduction**;

\*\*\*\*\*

**and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission**[.]

18 U.S.C. § 3582(c)(1)(A) (emphasis added). Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

## RELEVANT FACTS AND PROCEDURAL HISTORY

Mr. Etzel is presently serving a 96-month sentence imposed for one count of Possession with Intent to Distribute Methamphetamine under 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii) and one count of Felon in Possession of a Firearm under 18 U.S.C. § 922(g)(1). Mr. Etzel entered a plea of

guilty to those offenses on January 23, 2017. He has been in custody since his arrest on May 28, 2015, and, with earned good time credit, he has served almost 75 percent of his sentence. His current release date is March 21, 2022.

Mr. Etzel is 64 years old and has chronic bronchitis and hypertension. He has suffered from two onsets of double-lung pneumonia requiring hospitalization. He is scheduled to see a cardiologist every six months for his chronic cardio-pulmonary issues.

While in custody, Mr. Etzel has participated actively in programing. He has completed drug treatment classes, vocational training, and an apprenticeship as an electrician. Moreover, in his almost five years in custody, he has never received a disciplinary write-up.

On March 30, 2020, Mr. Etzel requested compassionate release from the warden at Sheridan and filed a pro se motion with the Court to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Dkt. 51). On April 2, 2020, Federal Defender Lisa Hay also wrote the warden at Sheridan on behalf of Mr. Etzel and requested compassionate release (Attachment A).

Mr. Etzel has submitted a plan for home confinement to the United States Probation Office. He hopes to be allowed to reside with a friend who is also willing to offer Mr. Etzel employment with her property management company. The friend's name has been provided to the Probation Office, and that office is working to evaluate the plan.

## ARGUMENT

**A.      Although It Has Not Yet Been 30 Days Since Mr. Etzel Submitted A Request For Compassionate Release To The Warden, The Court Should Excuse Exhaustion Of Administrative Remedies Given The Grave Risk From COVID-19 Exposure.**

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons (BOP), Congress expanded the statute in the First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As

amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

The reason for the expansion to include defense-filed motions was the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the *exclusive* channel through which a sentence reduction could be considered by courts." *Id.* (emphasis in original).

In this case, Mr. Etzel has not exhausted his administrative remedies, and 30 days has not passed since he submitted his request to the warden. However, the COVID-19 pandemic combined with Mr. Etzel's health conditions and age provide good reason for the Court to decide the motion now and excuse the statutory exhaustion/timing requirement.

The "exhaustion" component of 18 U.S.C. § 3582(c)(1)(A) is a non-jurisdictional claims processing rule because it merely states the conditions for court consideration of a defense motion. *United States v. Gentille*, No. 19 CR 590 (KPF), 2020 WL 1814158 (S.D.N.Y. Apr. 9, 2020) ("The Court agrees with the Government that § 3582(c)(1)(A)'s exhaustion requirement is not jurisdictional, but rather is a claims-processing rule that the Government can waive by failing to raise an exhaustion argument."). The statute grants courts the same sentence reduction authority regardless of whether a motion is brought by the defendant or by the BOP; the court's authority and obligation to consider the motion, and the standards for doing so, remain identical.

PAGE 4.    AMENDED MOTION TO REDUCE SENTENCE (COMPASSIONATE RELEASE)

Some courts, including one judge in this district, have held that the exhaustion provision is not amenable to any exception. *See, e.g.*, *United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440, at *7 (D. Or. Apr. 6, 2020) (Brown, J.) (finding no exception and citing other cases) (motion for reconsideration pending). However, the question of whether a statutory exhaustion requirement permits exception is a matter of statutory interpretation dependent on congressional intent. *See Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) ("Congress sets the rules — and courts have a role in creating exceptions only if Congress wants them to."). A statutory claims-processing rule, though expressed in mandatory terms, can nonetheless be subject to equitable exception. *See, e.g.*, *McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013) (acknowledging "miscarriage of justice" exception to procedural default under AEDPA); *Holland v. Florida*, 560 U.S. 631, 648-49 (2010) (incorporating equitable tolling into AEDPA's one-year statute of limitations).

On its face, § 3582(c)(1)(A) does not say one way or the other whether courts can excuse compliance with the exhaustion/timing provision. The legislative history, though, establishes that Congress's clear aim in passing the First Step Act's amendments to § 3582(c)(1)(A) was to accelerate compassionate release and to avoid dangerous administrative delays. Thus, it makes sense that Congress would have intended the provision to incorporate an equitable exception in case of emergency. As COVID-19 cases have inundated the federal prison system at an alarming rate, several courts across the country have excused compliance with the 30-day exhaustion requirement. *See e.g.*, *Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (holding that the 30-day requirement is non-jurisdictional and finding that circumstances exist to allow waiver); *United States v. Smith*, 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) (discussing how the government has waived exhaustion in several cases and holding "the First Step Act did not empower the Government with the sole authority to decide when and under what conditions

exhaustion may be waived"); *United States v. Sawicz*, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) (waiving the exhaustion requirement due to the COVID-19 outbreak and the defendant's risk of suffering severe complications due to his hypertension); *Miller v. United States*, No. 16-20222-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020) (finding an exception to the exhaustion requirement and providing: "Time is not on [defendant's] side. It is paramount to his safety to decide this issue promptly. Therefore, his request for release is properly before the Court."); *United States v. McCarthy*, No. 17-cr-230-JCH, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (holding that the exhaustion requirement can be waived); *United States v. Zukerman*, 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020) (holding "exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in [the defendant's] unique circumstances—by the COVID-19 pandemic"); *United States v. Colvin*, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (discussing the "catastrophic health consequences" that might result from delaying the motion for several weeks and the brief duration of the defendant's remaining custodial time); *United States v. Perez*, 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020) (holding that the defendant's "undisputed fragile health, combined with the high risk of contracting COVID-19 in the [detention center], justifies waiver of the exhaustion requirement"). The government has waived reliance on the provision in some cases. *See United States v. Knox*, No. 15-cr-445-PAE, ECF 1088 (S.D.N.Y. Apr. 10, 2020) (granting a motion for compassionate release after the government reconsidered its initial opposition in the motion based on the exhaustion requirement and filed a letter waiving the objection for an inmate who was high risk and had served the vast majority of his sentence); *Gentille*, 2020 WL 1814158, at 3 ("To its credit, the Government has determined to waive the exhaustion requirement in this case."); *United States v. Jasper*, No. 18 CR 390-18 (PAE), 2020 WL 1673140 (S.D.N.Y. Apr. 4, 2020) (noting that the government "has elected not to stand on the

requirement of administrative exhaustion in certain cases brought before judges in this District during the COVID-19 crisis"); *see also Smith*, 2020 WL 1849748, at *3 (discussing several cases where the government had waived the First Step Act exhaustion requirement and criticizing the government for its inconsistent position that the exhaustion requirement is jurisdictional).

The *Haney* case, which was issued this week, is particularly persuasive. In *Haney*, Judge Rakoff, begins, after a discussion of Supreme Court jurisprudence, by explaining that the exhaustion requirement is not a "jurisdictional" rule that deprives the court of jurisdiction:

> Instead, the exhaustion requirement in § 3582(c)(1)(A) merely controls who -- the BOP or defendant -- may move for compassionate release and when such a motion may be made. It simply delineates the process for a party to obtain judicial review, not referring to the adjudicatory capacity of courts. That is, § 3582(c)(1)(A) "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the [federal] courts." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982).

2020 WL 1821988, at *2. Next, after conducting a careful statutory interpretation analysis, Judge Rakoff concludes that "Congress cannot have intended the 30-day waiting period of § 3582(c)(1)(A) to rigidly apply." *Id.* at *4. Finally, applying the statute to the circumstances at hand, Judge Rakoff holds: "For these reasons, the Court concludes that Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually favors such waiver, allowing courts to deal with the emergency before it is potentially too late." *Id.*

In this case, as in *Zukerman*, "even a few weeks' delay carries the risk of catastrophic health consequences" for Mr. Etzel. 2020 WL 1659880, at *3. In just two weeks, COVID-19 has spread from a handful of people in a small number of federal prisons to reach 49 facilities, infecting more than 700 inmates and staff. BOP, *COVID-19*, https://www.bop.gov/coronavirus/ (last visited Apr. 14, 2020, at 2:24 p.m.); *see also* https://federaldefendersny.org/ (tracking BOP historical data).

PAGE 7.    AMENDED MOTION TO REDUCE SENTENCE (COMPASSIONATE RELEASE)

Fourteen prisoners have died. *Id.* Congress would not have wanted the Court to stand by for an additional 30 days in those circumstances. Instead, the Court should waive administrative exhaustion and consider Mr. Etzel's motion now. Put simply, a global life-threatening pandemic is an "extraordinary threat" to a prisoner with underlying respiratory and heart related medical conditions. *Zukerman*, 2020 WL 1659880, at *2.

**B.     Mr. Etzel's Vulnerability To COVID-19 Is An Extraordinary And Compelling Reason For An Immediate Sentence Reduction To Time Served.**

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction. Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," BLACK'S LAW DICTIONARY (11th ed. 2019). Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id.* The present global pandemic, which has spread through BOP facilities endangering prisoners and staff alike, is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes. The grave risk to Mr. Etzel from continued incarceration provides a compelling reason for his immediate release.

*1.     The Court Has Authority To Find Extraordinary And Compelling Reasons Other Than Those Expressly Identified In Commentary To U.S.S.G. § 1B1.13.*

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced

age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

The policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP. For that reason, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step Act statute. *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020) (internal quotation marks omitted); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019) (citing cases). In *United States v. Cantu*, the Court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under § 3582.

No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (emphasis in original). Similarly, in *Redd*, the court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants." 2020 WL 1248493, at *6. Therefore, the court concluded, "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'" *Id.*

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment, judges have found authority based on the catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those listed. *See, e.g.*, *United States v. Fox*,

No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change"). In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance." 2020 WL 1248493, at *7 (citing cases); *see also United States v. Rodriguez*, No. 2:03-cr-00271-AB, 2020 WL 1627331, at *7 (E.D. Penn. Apr. 1, 2020) ("[A] majority of district courts have concluded that the 'old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." (citation omitted)); *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

The government conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). The court in *Young* followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal

**PAGE 10.   AMENDED MOTION TO REDUCE SENTENCE (COMPASSIONATE RELEASE)**

judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id.*[1]

Accordingly, this Court has authority to consider whether the circumstances presented here are extraordinary and compelling under any of the existing categories in Application Notes 1(A) through (C) or based on the catchall "other reasons" category in Application Note 1(D).

> 2.   *COVID-19 Is An Unprecedented And Rapidly-Expanding Global Health Emergency That Presents A Serious Risk To Vulnerable Prisoners Like Mr. Etzel.*

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus that causes COVID-19 as a pandemic. *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020,* WORLD HEALTH ORGANIZATION (Mar. 11, 2020), https://bit.ly/2W8dwpS. On March 26, 2020, the United States became the global leader in COVID-19 infections. "COVID-19 is a serious disease" that makes certain populations of people severely ill and can lead to death. Declaration, Chris Beyrer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, ¶ 5 (Mar. 16, 2020) (Attachment B). The current best estimate is that the fatality rate among all demographics "is 5 [to] 35 times the fatality associated with influenza infection." Beyrer Dec. ¶ 5.[2] This new strain of coronavirus is highly contagious, and those who are infected can spread the virus even if they are asymptomatic. Marco Cascella et al., *Features, Evaluation and Treatment Coronavirus (COVID-*

---

[1] *See also United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *2-3; *Brown*, 411 F. Supp. 3d at 451; *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019).

[2] *See also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID JOURNAL (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

*19)*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION (NCBI) (Mar. 20, 2020), https://www.ncbi.nlm.nih.gov/books/NBK554776/#_ncbi_dlg_citbx_NBK554776. COVID-19.

COVID-19 presents a particular risk within prisons and jails. Conditions of imprisonment create the ideal environment for the transmission of contagious diseases. Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES, 1047, 1047 (2007), https://doi.org/10.1086/521910. "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. Moreover, incarcerated people tend to be in poorer health than the general population. According to a recent Bureau of Justice Statistics study, approximately half of state and federal prisoners and jail inmates have chronic conditions such as cancer, high blood pressure, diabetes, cirrhosis of the liver, heart disease, and asthma. Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, 2011-12, BUREAU OF JUSTICE STATISTICS, NCJ 248491, 1 (Rev. Oct. 4, 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

Reducing prison populations is an important measure to slow the spread of COVID-19. It protects not only those inmates released, but also the inmates who remain in custody, along with the prison staff and surrounding communities, because it allows for more effective use of limited staffing and housing resources. Sick prisoners can be more easily quarantined. Dorms and mess halls will be less crowded for purposes of social distancing. The remaining prisoners will have

greater access to laundry and restroom facilities. And necessary supplies for combatting the virus—cleaners, disinfectants, and personal protective equipment—will last longer.

For these reasons, the immediate need for reducing the numbers of incarcerated individuals is a point on which public health experts, policymakers, and the courts agree:

- "Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." Beyrer Declaration, ¶¶ 17, 19.

- "We need to take the unprecedented step TODAY of providing urgent release to everyone in the jails who is at risk of serious morbidity and mortality from COVID." Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, THE NEW YORKER (Mar. 20, 2020) (quoting Rachael Bedard, Rikers Island Geriatrician), https://www.newyorker.com/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus.

- "Conditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for transmission of contagious disease. For these reasons, it is important that consistent with the law and taking into account public safety and health concerns, that the most vulnerable inmates are released or transferred to home confinement, if possible." Letter from Senator Charles Grassley et al. to Attorney General William Barr and the Director of the Bureau of Prisons (Mar. 23, 2020) (Attachment C).

- "By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided." *United States v. Garlock*, No. 3:18-cr-00418-VC, 1439980 (N.D. Cal. Mar. 25, 2020) (CR 41).

- "These [Johns] Hopkins [University] faculty members believe 'an urgent priority in this time of national public health emergency [is] to reduce the number of persons in detention as quickly as possible.' . . . . They advise that reducing the number of detained persons in Maryland will make the community safer. The Court agrees." *United States v. Davis*, No. ELH-20-09, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020)

- "Congress and the Department of Justice are increasingly recognizing the danger of COVID-19 outbreaks in prison and encouraging steps to release some inmates. . . . Prisons are ill-equipped to prevent the spread of COVID-19." *United*

*States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *8 (E.D. Pa. Apr. 1, 2020).

- "[W]e believe that we need to prepare now, by 'decarcerating,' or releasing, as many people as possible, focusing on those who are least likely to commit additional crimes, but also on the elderly and infirm." Matthew J. Akiyama, et al., *Flattening the Curve for Incarcerated Populations – Covid-19 in Jails and Prisons*, THE NEW ENG. J. OF MED. (April 2, 2020), https://www.nejm.org/doi/full/10.1056/NEJMp2005687.

COVID-19 has made frightening inroads into the BOP, despite the agency's efforts to prevent an outbreak. As of April 13, 2020, the disease had reached 49 locations, with over 700 inmates and staff known to be infected. BOP, *Open COVID-19 Tested Positive Cases*, www.bop.gov/coronavirus (providing daily tallies of confirmed infections) (last visited Apr. 14, 2020, at 2:24 p.m.). Fourteen inmates, ages ranging from 43 to 81, have already died. BOP Press Releases, https://www.bop.gov/resources/news_stories.jsp (last visited Apr. 14, 2020, at 11:43 a.m.). The median age of those who have passed away from the virus is 57, several years younger than Mr. Etzel's age. *Id.*

The reported numbers underrepresent the scope of the problem. The BOP has frankly acknowledged that it is not testing every suspected infection. Walter Pavlo, *Bureau Of Prisons Underreporting COVID-19 Outbreaks In Prison*, FORBES (Apr. 1, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#7c9d4637ba32. The Bureau of Prisons has reported to congressional leaders that, as of April 7, 2020:

- **456 people** are in isolation (symptomatic but not necessarily tested);
- **3,850 inmates** are in quarantine; and
- **193 inmates** are quarantined at RRCs.

While there are no current confirmed cases of COVID-19 at Sheridan, where Mr. Etzel is housed, BOP has continued to transport prisoners from facilities where there are confirmed COVID-19

PAGE 14.   AMENDED MOTION TO REDUCE SENTENCE (COMPASSIONATE RELEASE)

cases to other facilities across the country. *See* https://thehill.com/blogs/congress-blog/politics/492452-the-bureau-of-prisons-must-do-more-to-flatten-the-curve ("In fact, over the past several weeks, while the rest of the country has been altering our daily routines and pausing our livelihoods to mitigate the spread of COVID-19, the Bureau of Prisons has continued to move inmates across the country."). In a recorded message to all staff on April 10, 2020, the Director of the BOP explained that although transfers had been greatly reduced, the BOP lacks the legal authority to stop all transfers, including those necessary for medical care, to facilitate court appearances, or to accept newly designated inmates or pretrial detainees. https://www.bop.gov/resources/news/20200411_dir_message.jsp.

3.   *Courts Responding to the Coronavirus Pandemic Have Granted Compassionate Release Based on Defendants' Heightened Vulnerability to COVID-19, Combined with Other Individualized Circumstances.*

Courts assessing compassionate release motions in light of the increasingly dire coronavirus pandemic have recognized that heightened COVID-19 vulnerability, combined with a defendant's individualized circumstances, can present extraordinary and compelling reasons to grant sentence reduction.

In *United States v. Colvin*, for example, the court found that the defendant's diabetes constituted a "'serious . . . medical condition,' which substantially increases her risk of severe illness if she contracts COVID-19." No. 3:19CR179 (JBA), 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020). The court further concluded that the defendant "was unable to provide self-care" in the custodial environment in light of the pandemic because "she is unable to practice effective social distancing and hygiene to minimize her risk of exposure[.]" *Id.*

In *United States v. Muniz*, the court granted compassionate release based on the fact that the defendant had "been diagnosed with serious medical conditions that, according to reports from

the Center for Disease Control, make him particularly vulnerable to severe illness from COVID-19," including end stage renal disease, diabetes, and arterial hypertension. No. 4:09-CR-0199-1, 2020 WL 1540325 (S.D. Tex. Mar. 30, 2020). The court recognized the "measures taken by the Federal Bureau of Prisons" to protect inmates, but nevertheless found the risk of outbreak to warrant release in the defendant's circumstances: "Because Defendant is at high-risk for severe illness from COVID-19 and because inmates in detention facilities are particularly vulnerable to infection, the Court finds that Defendant has demonstrated an extraordinary and compelling reason for compassionate release." *Id.*

In *United States v. Rodriguez*, the court granted compassionate release to a defendant with "diabetes, high blood pressure, and liver abnormalities." No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020). The court noted research showing that "diabetes patients, like Mr. Rodriguez, have mortality rates that are more than twice as high as overall mortality rates" from COVID-19 infections. *Id.* Citing the swift spread of coronavirus within BOP institutions, the court found that "prison is a particularly dangerous place for" vulnerable inmates like Mr. Rodriguez, and concluded that the BOP's proposed containment measures "have already proven insufficient." *Id.* at *7-9. The court concluded that the totality of the circumstances—Mr. Rodriguez's vulnerability to COVID-19, the risk of infection in prison, and the amount of time served along with demonstrated rehabilitation—constituted extraordinary and compelling reasons to reduce his sentence. *Id.* at *7.

And these decisions represent only a small portion of the compassionate release grants since the pandemic caught hold in the BOP. *See e.g.*, *Smith*, 2020 WL 1849748, at *4 (granting compassionate release because, in part, of the medical conditions that made the defendant high risk for contracting COVID-19); *United States v. Trent*, No. 16-cr-178-CRB (N.D. Cal. Apr. 9,

PAGE 16.   AMENDED MOTION TO REDUCE SENTENCE (COMPASSIONATE RELEASE)

2020) (finding extraordinary and compelling reasons to grant sentence reduction due to defendants serious medical condition in the context of the COVID-19 outbreak in prisons); *Miller*, 2020 WL 1814084 (noting "overwhelming" precedent in favor of granting compassionate release where the defendant "squarely fits the definition of an individual who has a higher risk of falling severely ill from COVID-19" and continuing his incarceration "could be a lethal decision") (citing cases); *see also Zukerman*, 2020 WL 1659880, at *6 ("When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic."); *United States v. Edwards*, No. 6:17-CR-00003, 2020 WL 1650406, at *6 (Apr. 2, 2020) ("Had the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in a federal prison would expose him to a heightened and substantial health risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months."); *United States v. Hernandez*, No. 18-cr-20474, ECF No. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer and immunosuppression and just under 12 months left to serve on 39 month sentence); *United States v. Perez*, No. 1:17-cr-513-AT, ECF No. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Marin*, No. 15-cr-252, ECF No. 1326 (E.D.N.Y. Mar. 30, 2020) (granting compassionate release due to the defendants "advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence"); *United States v. Bolston*, No. 1:18-cr-382-MLB, ECF No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued

incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justifies

his immediate release from custody"); *United States v. Powell*, No. 1:94-cr-316-ESH, ECF No. 98

(D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-

19).

> 4.    *Mr. Etzel's Heightened Risk Of Serious Illness Or Death If He Contracts COVID-19 In Custody, The Short Time Remaining On His Sentence, And His Excellent Prison Record Over The Course Of Almost Five Years In Custody Provide Extraordinary And Compelling Reasons For Sentence Reduction.*

In *Rodriguez*, the court aptly summarized:

> COVID-19 has paralyzed the entire world. The disease has spread exponentially, shutting down schools, jobs, professional sports seasons, and life as we know it. It may kill 200,000 Americans and infect millions more. At this point, there is no approved cure, treatment, or vaccine to prevent it. . . . For [prisoners at high risk from COVID-19], *nothing could be more extraordinary and compelling than this pandemic*.

2020 WL 1627331, at *1 (emphasis added). The same is true here. As noted in the Presentence

Report, Mr. Etzel suffers from hypertension and was diagnosed with Hepatitis C (PSR ¶ 81-82).

He also reports chronic bronchitis.  His hypertension places him at high risk for complications due

to COVID-19. *See https://academic.oup.com/ajh/article/doi/10.1093/ajh/hpaa057/5816609* ("The

most common comorbidities in one report were hypertension (30%), diabetes (19%), and coronary

heart disease (8%"). In addition, those with liver disorders, including when affected by Hepatitis

C, are at higher risk. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-

at-higher-risk.html;       https://www.hep.org.au/blog/coronavirus-covid-19-factsheet-for-people-

with-hepatitis-b-and-hepatitis-c/. Mr. Etzel's age also places him in the high-risk category

identified by the CDC.

Yet, as a Bureau of Prisons inmate, it is impossible for Mr. Etzel to follow the CDC's

recommendations to protect himself from exposure to this highly-transmissible disease. *See United*

PAGE 18.   AMENDED MOTION TO REDUCE SENTENCE (COMPASSIONATE RELEASE)

*States v. Gross*, No. 15-CR-769 (AJN), 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020) (recognizing that "not only is [the defendant] at a higher risk of serious illness if he contracts COVID-19 due to his underlying health conditions, but he is also at a higher risk of contracting COVID-19 due to his incarceration"). The CDC recommends for example, that if space allows, prisons should "reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions." https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. This has not occurred at Sheridan. In addition, Mr. Etzel, like other inmates, uses a group shower and encounters other inmates in group spaces. The only available way to contact family, for example, is through communally used phones and computers. Even during the current lockdown, inmates receive food from staff who walk from cell to cell. Prison guards also walk the unit, potentially bringing or spreading the virus.

Mr. Etzel has already served much of his sentence, and he has not received a single disciplinary infraction during his time in custody. Just as in the cases cited above, the entirety of the circumstances here provide extraordinary and compelling reasons to reduce Mr. Etzel's sentence to time served rather than requiring him to remain at Sheridan for 190 more days.

**C.    With Full Consideration Of The § 3553(a) Factors, Including The COVID-19 Pandemic, Converting The Remaining Term Of Imprisonment To Home Confinement Constitutes A Sentence Sufficient, But Not Greater Than Necessary, To Accomplish The Goals Of Sentencing.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). The Court can, and indeed must, consider post-offense developments under § 3553(a). *Pepper v. United States*, 562 U.S. 476, 490-93 (2011). Here, the relevant

§ 3553(a) factors are met by a sentence reduction to time served and release to supervision, with the added condition of home confinement.

The overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the circumstances of the present offense qualified Mr. Etzel for the sentence that the Court originally imposed, the Court could not have anticipated that the last 25% of his sentence would expose Mr. Etzel to a life-threatening illness when he is already medically fragile. Just as in *Zukerman*, the Court "did not intend for that sentence to 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic." 2020 WL 1659880, at *6. The Eighth Amendment's prohibition on cruel and unusual punishment precludes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to "contagious diseases caused by overcrowding conditions"). Based on these new circumstances, reducing the sentence to time served now, nine months in advance of his release date to community corrections, and imposing a term of home confinement as a condition of supervision instead, satisfies the purposes of punishment under § 3553(a).

Under *Pepper*, the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." *Id.* at 492. The changed circumstances aside from COVID-19 include Mr. Etzel's sustained good conduct and completion of substantial rehabilitative programming while in custody. Mr. Etzel's participation in drug treatment, vocational programing, and his clean prison records show the sincerity of his rehabilitation and dedication to leading a law-abiding life.

**PAGE 20. AMENDED MOTION TO REDUCE SENTENCE (COMPASSIONATE RELEASE)**

Mr. Etzel's release plan will further ensure his safe transition to the community. He hopes to be allowed to do home confinement with his friend, who has also offered him employment at her property management company. This plan has been presented to the U.S. Probation Office for review.

## CONCLUSION

For the foregoing reasons, Mr. Etzel respectfully requests that the Court grant reduction in sentence to time served and amend the conditions of supervised release to include a period of home confinement, including specifically 14 days of quarantine.

Respectfully submitted this 15th day of April, 2020.

 *s/ Lisa Hay*
Lisa Hay
Federal Public Defender
Attorney for Defendant

Jessica G. Snyder
Research & Writing Attorney

**PAGE 21.   AMENDED MOTION TO REDUCE SENTENCE (COMPASSIONATE RELEASE)**